On certified questions from the United States District Court for the District of Oregon dated October 19; certification accepted November 21, 2006; argued and submitted June 19, certified questions answered December 13, 2007

CONRAD ENGWEILER,
Lydell M. White,
and Laycelle T. White,
*Plaintiffs,*

*v.*

BOARD OF PAROLE
AND POST-PRISON SUPERVISION,
Robert O. Lampert, and Stan Czerniak,
*Defendants.*

(USDC NO. CV 06-957, CV 02-1453, CV 02-630;
SC S54153)

175 P3d 408

Andy Simrin, Salem, argued the cause for plaintiffs. With him on the brief was Dennis N. Balske, Portland.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for defendants. With her on the brief were

Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

LINDER, J.

## LINDER, J.

This case is before the court on certified questions of Oregon law from the United States District Court for the District of Oregon.[1] The questions arise in each of three habeas corpus cases pending before that court. All three federal habeas petitioners committed aggravated murder when they were juveniles under the age of 17. Each was prosecuted as an adult and, on conviction, sentenced to life imprisonment. The certified questions concern petitioners' statutory eligibility for parole and the legal effect of any administrative rules governing their potential parole eligibility. The specific questions that the federal court has certified to us are best understood in the context of the statutes and administrative rules that give rise to them. We therefore begin with that background, and then turn to the certified questions and our answers.

## I. BACKGROUND

The questions that the federal court has certified to us arise because of changes made to Oregon's laws punishing aggravated murder, as well as changes made to Oregon's sentencing laws more generally, through the 1980s. Before 1985, the maximum penalty for aggravated murder was life imprisonment, with a mandatory minimum sentence of either 20 or 30 years, depending on the particular form of aggravated murder committed.[2] Pursuant to ORS 144.110(2)(b) (1983), the Board of Parole (the board)[3] was prohibited from releasing on parole any person convicted of aggravated murder,

---

[1] See ORS 28.200 - 28.255 (describing certified question process); ORAP 12.20 (prescribing procedures for consideration of certified questions). See generally Western Helicopter Services v. Rogerson Aircraft, 311 Or 361, 811 P2d 627 (1991) (discussing factors that court considers in exercising discretion to accept certified questions).

[2] We describe here the penalty for aggravated murder immediately preceding the 1985 reinstatement of the death penalty. See ORS 163.095 (1983) (aggravated murder defined as murder under ORS 163.115 (1983) committed under specified aggravating circumstances); ORS 163.105 (1983) (specifying minimum terms of imprisonment for aggravated murder); ORS 163.115(3) (1983) (penalty for murder is life imprisonment). The evolution of Oregon's murder statutes and the penalties for murder and aggravated murder, including the anomalies that arose after Oregon's death penalty laws were declared invalid in 1981, are more thoroughly described in State v. Shumway, 291 Or 153, 157-62, 630 P2d 796 (1981), and State v. Quinn, 290 Or 383, 399-403, 623 P2d 630 (1981).

[3] The Board of Parole is now denominated the Board of Parole and Post-Prison Supervision. See ORS 144.005(1) (creating Board of Parole and Post-Prison Supervision).

except as provided in the statute providing those minimum terms. A juvenile 16 years of age or older who was alleged to have committed a criminal offense could be remanded to the appropriate court for trial as an adult. *Former* ORS 419.533 (1983), *repealed by* Or Laws 1993, ch 33, § 373. A juvenile so remanded and convicted of aggravated murder was subject to the same penalty as an adult; no provision exempted juveniles from the minimum term of incarceration required under ORS 163.105 (1983) or otherwise made juvenile aggravated murderers eligible for parole before an adult would be.

Oregon voters reinstated the death penalty for aggravated murder through a constitutional amendment and other enactments that became effective on December 6, 1984.[4] As amended, ORS 163.105 (1985) made the potential punishment for aggravated murder death, if the jury made the requisite statutory findings, or life imprisonment with a minimum term of 30 years without the possibility of parole. Or Laws 1985, ch 3, § 1. The statute governing the remand of juveniles to adult court was changed as well. The remand age was lowered to include juveniles 15 years of age or older at the time of the offense, but remand was limited to juveniles who allegedly had committed one of several enumerated felony offenses, including aggravated murder. Or Laws 1985, ch 631, § 1 (amending *former* ORS 419.533). Finally, the death penalty enactments included a statute that was new: ORS 161.620. Or Laws 1985, ch 631, § 9. That statute prohibited a trial court from imposing a death sentence or mandatory minimum sentence on any remanded juvenile, but it made an exception for the mandatory minimum sentence under ORS 163.105 if the juvenile committed aggravated murder at age 17.

Shortly after those changes took effect, the board modified its rules for setting parole release dates for persons convicted of aggravated murder. In particular, the board

---

[4] In the November 1984 General Election, voters enacted Article I, section 40, of the Oregon Constitution (authorizing death as sentence for aggravated murder if the jury makes the findings required by law; otherwise, the sentence is "life imprisonment with minimum sentence as provided by law"). Or Laws 1985, vol 1, p vi. At the same election, voters amended other existing statutes and enacted some new provisions. The statutes governing aggravated murder and the authorized sentences have been supplemented and amended numerous times since 1984. We discuss only those changes that bear on the questions before us.

deleted parole hearing procedures for persons convicted of aggravated murder from division 30 of OAR chapter 255, which was (and remains) the set of rules that governed parole release procedures for felony offenders generally. *See former* OAR 255-30-012 (deleted May 31, 1985). Simultaneously, the board created a new set of rules—division 32—that specifically addressed parole procedures for persons convicted of aggravated murder. Those rules—both procedurally and substantively—tracked the mandatory minimum sentence required by ORS 163.105(1) (1985). Under OAR 255-32-005 (1985), the rules required that an aggravated murderer receive a "prison term hearing" under the procedures provided in division 30 of the rules. OAR 255-32-010(1) (1985) identified the "minimum period of confinement for a person convicted of Aggravated Murder as defined by ORS 163.105(1) [(1985)]" to be 30 years. Thus, for persons convicted of aggravated murder, the rules did not provide for a proceeding in which a parole date would be determined until after the inmate had served the minimum term of confinement imposed pursuant to ORS 163.105(1) (1985). In effect, the rules did not anticipate the need to do so for any person convicted of aggravated murder. No board rule specifically addressed juveniles convicted of aggravated murder or made any other provision for them.

A few years later, another legislative change to Oregon's sentencing laws took place, one that also has bearing on the questions before us. Effective November 1, 1989, the legislature abolished Oregon's indeterminate sentencing system and replaced it with a so-called "sentencing guidelines" scheme. *See generally* Or Laws 1989, ch 790. Before that change, Oregon had used a "parole matrix system" for determining the actual length of an offender's incarceration. *See Hamel v. Johnson*, 330 Or 180, 185-86, 998 P2d 661 (2000) (explaining parole matrix system). Under the matrix system, for any particular offender, the trial court imposed an indeterminate sentence of a specified maximum duration, and the board determined the actual duration of imprisonment by its parole release decision. In contrast, under the sentencing guidelines system that came into force in 1989, trial courts are charged with imposing a determinate sentence for most felony convictions. That sentence is based on a

presumptive term determined pursuant to a set of legislatively approved guidelines, from which a sentencing court has limited discretion to deviate. The inmate then serves the sentence that the trial court imposes, without eligibility for release on parole. *See State ex rel Engweiler v. Cook*, 340 Or 373, 380-82, 133 P3d 904 (2006) (discussing former parole matrix system and current sentencing guidelines scheme). The sentencing guidelines system thus eliminated any kind of release on parole for persons subject to its provisions. Consistently with that change, the board amended its parole "matrix" rules—*i.e.*, division 30—to apply only to an inmate "whose crime was committed prior to November 1, 1989." OAR 255-30-010(1) (1989).

By late 1989, then, the board's rules had undergone two significant modifications. First, in response to the enactment of the death penalty provisions, the board had removed aggravated murder from division 30, which contains the "matrix" rules by which parole release dates are set for felony offenses generally; aggravated murder instead became subject to a separate set of rules set out in division 32. Second, in response to the new determinate sentencing guidelines scheme, the board expressly limited its parole authority under division 30 to felony offenses committed before November 1, 1989. Neither set of rules contained different provisions for juveniles convicted of aggravated murder. Instead, all persons convicted of aggravated murder, including juveniles under the age of 17 at the time of their offense, were subject to division 32, which was written with a built-in assumption that all persons convicted of aggravated murder were required to serve a 30-year minimum sentence under ORS 163.105(1) (1989).

That was the state of the board's rules when each of the three federal habeas petitioners—Conrad Engweiler, Lydell M. White, and Laycelle T. White (referred to individually by last name, or collectively as petitioners)—committed their crimes of aggravated murder. Engweiler committed aggravated murder in 1990. He was 15 years old at the time. The Whites, who are brothers, jointly committed aggravated murder in 1993. They, too, were 15 years old at the time of their crimes. All three juveniles were tried as adults, convicted of aggravated murder, and sentenced (Engweiler in

1994 and the Whites in 1995) to life imprisonment without a minimum sentence—that is, to life with the possibility of parole.[5]

In 1999, the board promulgated new rules as part of division 32 to establish procedures and standards by which the board would consider whether and when to grant parole to juvenile aggravated murderers (the "JAM" rules).[6] The board then applied those rules to petitioners. In Engweiler's case, the board entered an order that gave him a 480-month prison term and a corresponding "murder review date" of February 22, 2030; the board further ordered that a "murder review hearing" would be scheduled for him in December 2029. The effect of that order is that the board has not established an initial parole date for Engweiler. *Engweiler v. Board of Parole*, 340 Or 361, 371, 133 P3d 910 (2006) (*Engweiler II*). The board has, however, determined that, after 480 months, Engweiler will be eligible for consideration for parole and it has scheduled further proceedings for review. *Id.*; *State ex rel Engweiler*, 340 Or at 383. In each of the White's cases, the board imposed a prison term of "life," thus effectively determining that they should be denied release on parole. The board further ordered, however, that each of the Whites "may petition the board for a murder review hearing after serving 40 years."

All three petitioners unsuccessfully challenged the board's orders administratively and by seeking state appellate court review of them. Petitioners since have filed for habeas corpus relief in federal district court, which, as we

---

[5] Engweiler was initially sentenced to life imprisonment with a 30-year minimum sentence, pursuant to ORS 163.105(1) (1989). His appeal resulted in the Court of Appeals decision holding that juveniles who commit aggravated murder while under the age of 17 are not subject to the 30-year minimum sentence under ORS 163.105(1) (1989). *State v. Engweiler*, 118 Or App 132, 136, 846 P2d 1163 (1993) (*Engweiler I*). Engweiler's sentence was reversed and, on remand in 1994, he was sentenced to life imprisonment without a minimum sentence. The Whites were sentenced in 1995, after Engweiler's appeal. In addition, the district court record reveals that two other juveniles are similarly situated to Engweiler and the Whites. Evidently, then, a total of five inmates are affected by the answers we give to the district court's questions.

[6] Both the federal district court and the parties refer to those 1999 rules as the "juvenile aggravated murder (JAM)" rules. In the interest of consistency, we use that same shorthand.

have described, led to that court's certification of three questions to this court. We turn to those questions.

## II. DISCUSSION

A. *The first certified question*

The first certified question asks:

"Whether ORS 144.110(2)(b), 163.105(1) and 161.620[7] combined to create a situation in which certain juveniles (ages 15-16) convicted of aggravated murder were not entitled to the possibility of parole for crimes committed after October 31, 1989 and prior to April 1, 1995."[8]

The question arises because the cited statutes, at least at first blush, were potentially inconsistent in their terms. ORS 144.110(2)(b) (1989) provided, in part, that "[t]he board shall not release a prisoner on parole who has been convicted of murder defined as aggravated murder under the provisions of ORS 163.095, except as provided in ORS 163.105." In turn, as already described, other than a sentence of death, the only sentence that ORS 163.105(1) (1989) authorized for aggravated murder was life with a minimum term of 30 years without the possibility of parole. Neither statute, by its terms, made any exception for juveniles who committed aggravated murder. ORS 161.620 (1989), on the other hand, precluded the imposition of a mandatory minimum sentence on any juvenile convicted of an adult crime,

---

[7] The question does not specify which versions of the statutes are at issue. As mentioned earlier, Engweiler committed aggravated murder in February 1990 and was resentenced to an indeterminate sentence of life imprisonment in November 1994; the Whites committed aggravated murder in August 1993 and were sentenced to indeterminate sentences of life imprisonment in January 1995. The substantive text of the relevant statutes did not change in any significant respect during that full time period—*i.e.*, between the date on which Engweiler committed aggravated murder and the date on which the Whites were sentenced in 1995. Thus, in answering the certified questions, we discuss the 1989 versions of the statutes.

[8] The beginning and ending dates in the certified questions reflect the effective date of the sentencing guidelines, in 1989, and a 1995 amendment to ORS 161.620, which deleted the phrase "where the person was 17 years of age at the time of the offense," and thus made juveniles subject to the minimum sentences under ORS 163.105 for aggravated murder. *See* Or Laws 1995, ch 422, § 131y.

except for a juvenile who committed aggravated murder at age 17. Specifically, ORS 161.620 (1989) provided:

> "Notwithstanding any other provision of law, a sentence imposed upon any person remanded from the juvenile court under ORS 419.533 shall not include any sentence of death or life imprisonment without the possibility of release or parole nor imposition of any mandatory minimum sentence except that a mandatory minimum sentence under ORS 163.105(1)(c) shall be imposed where the person was 17 years of age at the time of the offense."

■ The answer to the apparent tension in the statutes lies in the first sentence of ORS 161.620 (1989).[9] It declares that ORS 161.620 (1989) precludes imposition of any mandatory minimum sentence on a juvenile (except for one who was 17 when he or she committed aggravated murder) "[n]otwithstanding any other provision of law." The function of a "notwithstanding" clause is straightforward. It operates as an exception to whatever follows. *Severy v. Board of Parole*, 318 Or 172, 178, 864 P2d 368 (1993) (function of a notwithstanding clause is to operate as "an exception to the provisions of law referenced in the clause"). That means, in this instance, that the terms of ORS 161.620 (1989) prevailed over "any other provision of law." In other words, the notwithstanding clause made it irrelevant that ORS 144.110(2)(b) (1989) and ORS 163.105(1) (1989) each mandated a minimum sentence of 30 years without the possibility of parole for any person convicted of aggravated murder and made no exception for persons who were juveniles under the age of 17 when they committed their crime.

___

[9] The answer has been suggested before. Engweiler initially received a 30-year minimum sentence under ORS 163.105 (1989). On appeal of his conviction, he challenged that sentence in the Court of Appeals. That court held that ORS 161.620 (1989) precludes imposition of the 30-year mandatory minimum sentence for aggravated murder on juveniles who were under age 17 at the time of the crime. *Engweiler I*, 118 Or App at 136. This court denied review of that decision. *State v. Engweiler*, 317 Or 486, 858 P2d 876 (1993). More recently, when Engweiler pursued his challenges to the board's order setting his prison term and murder review date, this court contrasted the terms of ORS 163.105 (1989) with those of ORS 161.620 (1989) and observed: "Accordingly, the only sentencing option available to the sentencing court in petitioner's case was life imprisonment with the possibility of release or parole[.]" *State ex rel Engweiler*, 340 Or at 383.

It follows from the foregoing that the answer to the first question is "no." ORS 144.110(2)(b) (1989), ORS 163.105(1) (1989), and ORS 161.620 (1989) did not "combine [ ] to create a situation in which certain juveniles (ages 15-16) convicted of aggravated murder were not entitled to the possibility of parole for crimes committed after October 31, 1989 and prior to April 1, 1995." Instead, ORS 161.620 (1989) trumped the other two statutes by precluding imposition of the 30-year mandatory minimum sentence otherwise authorized by ORS 163.105(1) (1989) for juveniles who were under age 17 when they committed aggravated murder. Consequently, petitioners must be entitled to the possibility of parole.

B.  *The second certified question*

██  The federal district court's second certified question asks:

> "Whether, prior to promulgating its juvenile aggravated murder (JAM) rules in 1999, the Board of Parole and Post-Prison Supervision (Board) had any rules for establishing prison terms for juvenile offenders (ages 15-16) convicted of aggravated murder committed after October 31, 1989 and prior to April 1, 1995, and if not, whether the Board had the statutory authority to promulgate its JAM rules in 1999, establishing prison terms for juvenile offenders (ages 15-16) convicted of aggravated murder committed after October 31, 1989 and prior to April 1, 1995."

The question has two parts. The first part asks if, before promulgating the JAM rules, the board had any rules for establishing prison terms for juveniles convicted of aggravated murder. The second half asks, if not, whether the board had statutory authority to adopt the JAM rules that it promulgated in 1999.

As for the first half of the district court's question, the parties do not disagree about what rules in fact were in existence when petitioners committed their crimes. Rather, the dispute is over the legal effect of those rules and whether any of them correctly could be applied to petitioners. We understand that to be the point of the first part of the federal court's question.

Our answer is that, when petitioners committed their crimes, none of the board's existing rules provided either procedural or substantive mechanisms to determine whether and when to parole juvenile aggravated murderers. The board had no such rules in place until 1999, when it promulgated the JAM rules. As described earlier, Engweiler committed aggravated murder in 1990 and the Whites committed aggravated murder in 1993. The pertinent rules in force on the date of their crimes were the 1989 versions of division 30 (the parole matrix provisions for felony offenders generally) and division 32 (specific provisions governing parole of aggravated murderers) of OAR chapter 255. By 1989, consistently with the enactment of Oregon's death penalty provisions, the board had removed aggravated murder from the substantive provisions in division 30 and had promulgated division 32, which specifically applied to aggravated murderers only.[10] Consistently with the sentencing guidelines provisions, the board also had amended division 30 to apply only to persons who committed felonies before November 1, 1989. Petitioners thus did not come within the ambit of the division 30 rules, both because of the crimes that they committed (aggravated murder) and the date on which they committed them (after November 1, 1989).

Division 32, in contrast, potentially applied to petitioners, because it purported to govern any person convicted of aggravated murder. The problem, however, is that division 32 contained no rule that fit petitioners' distinctive circumstance of being juveniles who, because of ORS 161.620 (1989), could not be sentenced to a 30-year minimum term of imprisonment for aggravated murder. Specifically, OAR 255-32-005 (1989) provided:

---

[10] Petitioners nevertheless argue that, when Engweiler committed his crimes, exhibits to the board's rules continued to list aggravated murder as a category 7 or 8 offense for purposes of calculating parole release under the parole matrix system for general felony offenders (*i.e.*, division 30). OAR ch 255, Ex A, Pts I & II (1990). That continued reference was a holdover from the former rule and had been deleted by the time the Whites committed their crimes. *See* OAR ch 255, Ex A (1992), *available at* http://www.oregon.gov/BOPPPS/docs/Rules/ExhA.pdf. It therefore would not aid the Whites. In all events, petitioners have not demonstrated how that reference in the exhibits, without more, had legal significance once aggravated murder had been removed from the substantive provisions of the division 30 rules and had become the subject of the division 32 rules.

> "(1)   A person convicted of Aggravated Murder under ORS 163.095 shall receive a prison term hearing under the provisions of Division 30 of these rules. A review date *congruent with the minimum terms set forth in 255-32-010* shall be set rather than a parole release date.
>
> "(2)   Persons sentenced to death or life without the possibility of release or parole shall not receive a prison term hearing."

(Emphasis added.) In turn, OAR 255-32-010(1) (1989) provided:

> "The minimum period of confinement for a person convicted of Aggravated Murder *as defined by ORS 163.105(1) shall be thirty (30) years.*"

(Emphasis added.) In effect, the 1989 rules tracked the 30-year minimum sentence under ORS 163.105(1) (1989) by precluding any parole eligibility review and the setting of a parole release date for aggravated murderers until they had served that mandatory minimum sentence. *See generally Engweiler II*, 340 Or at 371 (under the board's rules, a murder "review date" does not establish the date on which an inmate is to be released on parole, but instead determines when the inmate is entitled to further parole review). The board had no rule that similarly tracked ORS 161.620 (1989) by making an exception for juveniles who were under age 17 when they committed aggravated murder, and who therefore were entitled to parole consideration without first serving a minimum sentence. The rules that the board had in place as of the date of petitioners' crimes for persons convicted of aggravated murder therefore did not fit petitioners' particular circumstances and could not be applied to them.

On that last point, the parties agree. In particular, petitioners agree that the 1989 provisions of division 32 could not be applied to them. Petitioners maintain, however, that nothing prevented the board from applying the general parole "matrix" provisions of division 30, which remained in place for certain felony offenses generally, including murder. Petitioners assert that aggravated murder, as a more specific form of murder,[11] fit within those rules. That argument fails,

---

[11] *See* ORS 163.095 (1989) (defining aggravated murder as murder under ORS 163.115 (1989) committed under specified aggravating circumstances).

for at least two reasons. First, the board specifically removed aggravated murder from division 30 and made it the subject of a special set of parole rules set forth in division 32. Second, the board limited division 30 to felonies committed before November 1, 1989. Thus, by their terms, neither set of rules applied to petitioners. That fact does not mean that petitioners were entitled to choose which nonapplicable rule they would nevertheless like to have applied to them. Rather, it means that the board's rules contained a void, one that the board filled when it promulgated the JAM rules in 1999.[12]

We turn, then, to the second part of the second certified question—whether the board had the authority to promulgate the JAM rules. The dispute on that point is not whether the board had authority to promulgate *some* set of rules that would apply to juvenile aggravated murderers. On that score, petitioners and the board agree that the board had such authority, either pursuant to the board's express statutory rulemaking authority or because such authority must be implied to give effect to ORS 161.620 (1989), which requires that juvenile aggravated murderers under the age of 17 be eligible for parole consideration.[13] The dispute instead is whether the particular JAM rules that the board promulgated in 1999 exceeded the board's authority. We begin by describing the provisions of the JAM rules that the board adopted in 1999. We then address petitioners' argument that certain provisions of those rules run afoul of what the board is statutorily obligated to accomplish by rule.

---

[12] Petitioners further point out that the board apparently used the matrix provisions for murder in division 30 (as opposed to those in division 32 for aggravated murder) to establish parole release dates for two other juvenile aggravated murderers, Karl Kazor and Michelle Burks. One answer to their argument is that Kazor and Burks committed their aggravated murders in 1988, and thus fell within the time period to which division 30 continues to apply. Beyond that, as the board acknowledges, for a while "the issue of how to deal with this category of juvenile aggravated murderers [was] one that troubled" both the board and its lawyers. Eventually, the board determined on advice of counsel that it had misapplied the matrix provisions of division 30 to Kazor and Burks. That advice is consistent with our analysis. Suffice it to say, the fact that the board misapplied its rules to Kazor and Burks does not require it to continue to do so for other juvenile offenders.

[13] In promulgating its JAM rules, the board expressly relied on the then current versions of ORS 144.110(2)(b), ORS 163.105(1), and ORS 144.780 (*i.e.,* the 1997 versions of those statutes); the board also relied on the 1994 version of ORS 161.620. *See also* ORS 144.050 (which, from 1959 to the present, has authorized the board to establish rules applicable to parole).

As already described, the board made the JAM rules a part of division 32 of OAR chapter 255, the rules that govern parole procedures for aggravated murderers more generally. In adopting the JAM rules, the board amended some of the preexisting division 32 rules so that they govern "adult" offenders only,[14] and also added new provisions to address juvenile offenders specifically. As pertinent here, the JAM rules require the board to hold an initial "prison term hearing" for juveniles convicted of murder who were under age 17 at the time of the offense. OAR 255-032-0005(4) (1999). At that hearing, the board sets "a review date * * * rather than a projected parole release date." *Id.* Alternatively, the board may "deny parole" altogether. OAR 255-032-0011(2) (1999). If the board opts to set a review date, it does so based on a parole release matrix that it adopted specifically for juvenile aggravated murderers who are eligible for parole consideration. *Id.* (cross-referencing Exhibit Pt-III). Essentially, that matrix establishes ranges of time periods that dictate whether and when a juvenile aggravated murderer will be reviewed for parole eligibility and will receive a parole release date. At the low end, the matrix can result in a review date between 240 and 300 months. *Id.* At the high end, it can result in a "life" term, which is a denial of parole. *Id.* The review date then triggers a schedule for further board review of the inmate's institutional conduct and rehabilitation efforts, after which the board may establish a parole release date under the matrix or may set another review date at which it will further review the inmate's conduct and rehabilitation efforts. OAR 255-032-0011(6) - (7) (1999); *see also State ex rel Engweiler*, 340 Or at 383 (so concluding). If the board denies parole, the inmate is not totally foreclosed from future parole consideration. Rather, after 480 months, the inmate may petition the board for further review, and then may continue to do so periodically. OAR 255-032-0011(5), (7) (1999).

---

[14] *Compare* OAR 255-32-005(1) (1989) (requiring board to set review date congruent with minimum term in OAR 255-32-010 (1989)), *and* OAR 255-32-010(1) (1989) (identifying minimum period of confinement for persons convicted of aggravated murder as 30 years pursuant to ORS 163.105), *with* OAR 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(1) (1999), *and* OAR 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(1) (1999).

Petitioners argue that the JAM rules exceed the board's statutory authority, because they run afoul of ORS 144.780(1) (1997), which provided, in part:

> "The [Advisory Commission on Prison Terms and Parole Standards] shall propose to the board and the board shall adopt rules establishing ranges of duration of imprisonment to be served for felony offenses prior to release on parole. The range for any offense shall be within the maximum sentence provided for that offense."

According to petitioners, the statute obligates the board to establish a "duration of imprisonment" at a juvenile aggravated murderer's initial prison term hearing. In petitioners' view, the quoted phrase equates with a prison term based on a parole release date. As just outlined, the JAM rules do not permit setting an actual parole release date at the initial prison term hearing. Instead, under those rules, the board sets a "prison term" that is coextensive with the "review date." That prison term is not the functional equivalent of one based on a parole release date, and it does not establish the actual period of an inmate's incarceration. *See State ex rel Engweiler*, 340 Or at 383 (a "prison term" under the JAM rules does not establish a parole release date or otherwise set a discrete term of imprisonment that the inmate will serve). Rather, it triggers further review that, depending on an inmate's conduct and rehabilitation efforts, may result in setting a parole release date in the future. Consequently, petitioners argue, the JAM rules do not comport with the directive of ORS 144.780(1) (1997) because they do not require the board to set a juvenile aggravated murderer's parole release date at the initial parole hearing.

Petitioners misread that statute. Its terms do not require the board, at an initial prison term hearing, to establish the actual "duration of imprisonment" to be served by an individual felony offender before his or her release on parole. Instead, the statute authorizes and directs the board to adopt "ranges" of duration of imprisonment to be served for "felony offenses," ranges that are "within the maximum sentence provided" for each offense. The board is to do so through its rule-making authority. In other words, the statute requires the board to make the generally applicable policy choice of deciding what ranges of incarceration should be served for

particular crimes. The statute is not directed to the adjudicative process by which the board applies those ranges to an individual offender—that is, the statute is not directed to the process by which the board determines whether and when to set a release date for that individual offender.

The board's JAM rules comply with that understanding of the statutory directive. They establish a matrix for aggravated murder committed by juveniles under the age of 17, one that identifies "ranges of duration of imprisonment" based on the circumstances of the offense and the offender. Under the board's JAM rules, the board follows a hearing process by which it either denies parole or, alternatively, sets a review schedule pursuant to which it may eventually set a parole release date for the inmate. ORS 144.780(1) (1997) is not offended by that procedural choice on the board's part.[15]

In sum, our answer to the first part of the second certified question is that the board, before promulgating the JAM rules in 1999, did not have rules in place that it correctly could apply to juveniles convicted of aggravated murder to determine whether or when to release them on parole. Our answer to the second part of the question is that the board did not exceed its statutory authority in adopting the particular JAM rules that it promulgated in 1999.

## C. *The third certified question*

■  ▪ The third certified question asks:

"Whether the prison terms set by the Board under the 1999 JAM rules for offenders (ages 15-16[)] convicted of aggravated murders committed after October 31, 1989 and prior to April 1, 1995 are a [mandatory] 'minimum' sentence that is prohibited in ORS 161.620."[16]

---

[15] Petitioners also argue that the JAM rules are "inconsistent" with ORS 161.620 (1989) because the ranges under the JAM matrix effectively impose a "mandatory minimum sentence" on juvenile aggravated murderers. That argument is addressed by the answer to the third certified question, below.

[16] The certified question omits the word "mandatory," although ORS 161.620 (1989), which was set out in full earlier in this opinion, prohibited the imposition of any "mandatory minimum sentence" on a juvenile who committed aggravated murder while under age 17. We therefore answer the question with that clarification. *See Western Helicopter Services*, 311 Or at 370 (this court may, in its discretion, modify or clarify certified question).

As we explain, we conclude that the prison terms established by the board under the JAM rules are not "mandatory minimum sentences" within the meaning of ORS 161.620 (1989).

Regarding the federal court's third question, our decision in *State v. Jones*, 315 Or 225, 844 P2d 188 (1992), is dispositive. In that case, this court interpreted the phrase "mandatory minimum sentence" in ORS 161.620 (1989) to mean a minimum period of incarceration that a trial court, by statute, is required to impose as part of an offender's sentence. *Id.* at 230. In so holding, we emphasized that the purpose of ORS 161.620 is to give "trial judges flexibility in sentencing most remanded juveniles." *Id.* We therefore interpreted the term "mandatory minimum sentence" to include any sentence that a trial court is statutorily obligated to impose, regardless of whether the board has authority later to override that sentence. *Id.*

A prison term established under the JAM rules for a juvenile aggravated murderer does not satisfy that meaning. It is not imposed as part of the sentence ordered by the trial court, pursuant to a statutory mandate or otherwise; instead, it is imposed pursuant to the ranges established by board rule pursuant to the parole matrix specially adopted for juvenile offenders. *A fortiori*, the board's action in setting a prison term does not fall within the literal meaning of "mandatory minimum sentence" in ORS 161.620 (1989).

Petitioners acknowledge as much. They concede that a prison term established by the board under the JAM rules "is not, technically speaking, a mandatory minimum sentence[.]" They argue, however, that it is the "functional equivalent" of a mandatory minimum sentence because, under the matrix for juvenile aggravated murderers, no inmate can receive a term of incarceration of less than 240 months. The question is not, however, whether the board-imposed prison term is the "functional" equivalent of a mandatory minimum sentence, as that term is used in ORS 161.620 (1989). The question is whether it is the *legal* equivalent. The test of legal equivalency is the correct one, because petitioners' theory requires that the JAM rules impose what ORS 161.620 (1989) forbids. Under our holding in *Jones*, the statute forbids only those minimum terms that a sentencing court

would otherwise be legally obligated to impose as part of a juvenile offender's sentence. A prison term imposed pursuant to the JAM rules does not fall within that legal prohibition.

Our answer to the third certified question is therefore "no." The prison terms set by the board under the JAM rules are not "mandatory minimum sentences" that are prohibited by ORS 161.620 (1989).

Certified questions answered.